UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PHILIP COLUMBO,

                          Plaintiff,

             v.

PHILIPS BRYANT PARK LLC d/b/a THE
BRYANT PARK HOTEL LLC, PHILIPS
INTERNATIONAL HOLDING CORP., ASG
EQUITIES LLC, MAVERICK MANAGEMENT
CORP., PHILIP PILEVSKY, ISAAC GINDI,
EZRA SULTAN, MICHAEL PILEVSKY, SHEILA
CHESS, SETH PILEVSKY, XYZ
CORPORATIONS 1-10, and JOHN AND JANE
DOES 1-10,

                          Defendants.

22-CV-775 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

Plaintiff Philip Columbo brought this action against his former employer, Philips Bryant

Park LLC d/b/a The Bryant Park Hotel (the "Hotel"); corporations with ownership shares in the

Hotel, Philips International Holding Corp., ASG Equities LLC, and Maverick Management Corp.;

and executives of the Hotel or the corporations with ownership shares in the Hotel, Philip Pilevsky,

Isaac Gindi, Ezra Sultan, Michael Pilevsky, Sheila Chess, and Seth Pilevsky (collectively,

"Defendants"). Columbo also brought this action against XYZ Corporations 1–10, currently

unknown affiliated entities, and against John and Jane Does 1–10, currently unknown individuals

who controlled Columbo's workplace, supervised him, or contributed to the conduct underlying

his claims. Columbo raises claims sounding in contract, quasi contract, and tort, in addition to

claims under various state and federal statutes. Before the Court is Defendants' partial motion to

dismiss, in which they seek dismissal of all claims against all Defendants, with the exception of

Columbo's breach-of-contract claim against the Hotel. For the reasons that follow, the motion to dismiss is granted in part, and denied in part. Defendants' motion to dismiss is granted, save for its motion to dismiss Columbo's conversion claims brought against Defendants Sheila Chess, Michael Pilevsky, and the Hotel.

## FACTUAL BACKGROUND

The facts in this section and throughout are taken from the Complaint and its attachments and are assumed to be true for purposes of this motion. *See Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (holding a court may consider "documents attached to the complaint as an exhibit or incorporated in it by reference.").[1]

### I.       Plaintiff's Employment at the Bryant Park Hotel

Columbo was first employed by the Hotel in July 2002, beginning as an independent consultant. Compl. ¶¶ 1, 19. In April 2003, he became the Hotel's Asset Manager and Managing Director, a full-time position, and remained employed by the Hotel in that role until August 2021. *Id.* His starting annual salary in this position was $264,000, and by March 2020, his annual salary was $375,000. *Id.* ¶¶ 1, 29.

In June 2006, Gindi and Sultan, executives at Century 21, approached Columbo to discuss his retirement benefits. *Id.* ¶¶ 7–8, 20. Acting on behalf of the Hotel, Gindi and Sultan presented Columbo with an incentive-based, nonqualified deferred-compensation plan "in recognition of Columbo's contributions and loyalty," and with the "expectation that Columbo would remain in dedicated service to Defendants for a significant period of time." *Id.* ¶ 20, Ex. A. Gindi and Sultan informed Columbo that, beginning in 2007, Defendants would contribute to a separate, designated

---

[1] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

account on his behalf. *Id.* The amount of the Hotel's contributions were to be based on the Hotel's financial performance. *Id.* The contributions would be available for investment and to accrue interest. *Id.* Over time, the funds would vest and be distributed upon qualifying events, including upon resignation, upon termination without cause, or upon the sale of the Hotel. *Id.* ¶ 20, Ex. A. In June 2006, Sultan emailed Columbo with details about the nonqualified deferred-compensation plan and a sample incentive schedule. *Id.* Ex. A.

Gindi, Sultan, and Columbo met every December through 2019 to discuss Defendants' contribution to Columbo's plan. *Id.* ¶ 21. At each of these meetings, Gindi and Sultan represented to Columbo that the calculated contributions would be directed to his account and managed for him. *Id.* Philip Pilevsky also represented to Columbo on a regular basis that the Hotel ownership group approved these contributions. *Id.* ¶¶ 21, 26. During a December 2019 meeting, Gindi and Sultan assured Columbo that they were "going to take care of [him] and make [him] whole." *Id.* ¶ 26.

As of December 2010, Columbo's account contained $236,786.81. *Id.* ¶ 22. In March 2011, however, Defendants began to withdraw funds from the account and "loan" itself the money to cover the Hotel's operational needs. *Id.* By the end of 2011, Columbo's account was empty. *Id.* Although the Hotel's records indicated that Defendants owed Columbo additional contributions for subsequent years—including $18,775 in 2011, $29,575 in 2013, $59,975 in 2014, $15,425 in 2017, and $21,600 in 2018—as well as reimbursement of bank fees associated with the account, Defendants never deposited these amounts into Columbo's account. *Id.* Business records dated August 27, 2018 showed that Defendants owed a $382,374.57 debt to Columbo. *Id.* ¶ 22, Ex. B. And this sum did not include the interest Columbo would have received had the funds remained in his account collecting interest. *Id.* ¶ 22. Defendants never replenished these funds. *Id.* ¶ 38.

Defendants also invited Columbo to represent the Hotel on the Board of Directors of the Bryant Park Corporation, a role he fulfilled from 2017 to 2021. *Id.* ¶ 25. Although Columbo was not compensated for this position, he was "reminded by the individual Defendants that he would be 'taken care of' when the time came through the Hotel's deferred compensation plan." *Id.*

## II.    Impact of COVID-19 on the Hotel's Operations

The COVID-19 pandemic severely impacted the revenue and operations of the Hotel beginning in March 2020. *Id.* ¶ 27. By mid-March 2020, the Hotel shut down operations, and on March 19, 2020, Chess, on behalf of the Hotel ownership group, laid off 118 of the Hotel's 121 employees. *Id.* The Hotel ownership group immediately terminated the health insurance of the laid-off employees and refused to compensate them for their accrued, but unused, time-off benefits. *Id.* Columbo remained employed and was vocal about his disagreement with the Hotel ownership group's termination of these employees. *Id.* According to Columbo, after he expressed his concern about the layoff policy, "Defendants noticeably began treating Columbo differently." *Id.* ¶¶ 27–28. In the aftermath of the layoffs, numerous former employees sued the Hotel. *Id.* ¶ 48. Columbo was often implicated in these suits, as a party or a witness. *Id.* ¶ 27.

In light of the pandemic, Columbo's role at the Hotel changed. *Id.* ¶ 29. Defendants took over the management of the Hotel's finances. *Id.* ¶¶ 29–30. As the only full-time employee, Defendants asked Columbo to work seven days a week and to be available twenty-four hours a day. *Id.* ¶ 30. Columbo's supervision structure also changed at this time, and he was subjected to "the Pilevskys' and Chess's . . . control and authority with every move." *Id.* ¶ 29. Columbo's annual salary was lowered from $375,000 to $175,000 in March 2020. *Id.*

Increasing levels of crime and homelessness in the area around the Hotel caused Columbo to fear for his safety while he was alone in the hotel, especially at night. *Id.* ¶ 30. Chess's

"heightened, aggressive rhetoric" and Columbo's concerns that he would be abruptly cut off from employment or from his deferred-compensation benefits caused him stress. *Id.*

In September 2020, the Hotel began admitting guests again, and hired twelve employees. *Id.* ¶ 31. Short-staffed, Defendants asked Columbo to check in guests, clean rooms, and to "[r]oll up [his] sleeves and do what [he] ha[d] to do." *Id.*

### III.   The End of Plaintiff's Employment at the Hotel

In contemplation of his retirement, in July 2021, Columbo inquired about his deferred-compensation fund in a formal letter to Defendants, seeking assurance that funds would be disbursed to him upon his retirement as promised. *Id.* ¶¶ 33–34. Defendants did not respond at that time, even though email correspondence indicates that Michael Pilevsky, Chess, and the Hotel's part-time Chief Financial Officer knew by March 2021 that they owed Columbo at least $382,375. *Id.* ¶ 33, Ex. C. Columbo alleges that Defendants Philip Pilevsky, Gindi, and Sultan also knew about the money owed to him. *Id.* ¶ 33.

As a result of what he characterizes as a "constructive discharge," in August 2021, Columbo provided Defendants with a formal notice of retirement. *Id.* ¶ 35. Per Defendants' request, Columbo agreed to work until September 10, 2021 so that his replacement could be hired and trained. *Id.* He also agreed to Defendants' request that he remain available up to ninety days after his last day of work, as long as Defendants committed to providing him his deferred-compensation funds and to compensating him during this transition period. *Id.* ¶¶ 35, 42. Defendants agreed. *Id.* ¶ 36. Chess told Columbo that Defendants "fully intended to honor the financial commitments they made to [him]." *Id.* As a show of good faith, Defendants sent Columbo $50,000 of the money they owed him and promised him the rest would soon follow. *Id.* Defendants subsequently paid him another installment of $10,000. *Id.* ¶ 37. In total, Columbo received $60,000

of the $382,374.57 pre-interest funds that Defendants owed him. *Id.* ¶ 38. Defendants then cut off Columbo's health insurance on August 27, 2021, without notice. *Id.* ¶ 40. Columbo had paid for the insurance (with deductions from his payroll) through August 31, 2021. *Id.*

## IV.    Plaintiff's Claims

Columbo's claims arise from Defendants' alleged unlawful withholding of his deferred-compensation funds; failure to properly manage those funds; conversion of the funds for their own benefit; exposure of Columbo to dangerous employment conditions; placement of Columbo's health and safety at risk; termination of Columbo's health-insurance benefits; withholding of compensation; defamation of Columbo's character; and control of Columbo during legal arbitrations. *Id.* ¶¶ 18, 44–50.

Columbo brings claims for breach of contract; promissory estoppel; breach of fiduciary duty; fraud and intentional misrepresentation; negligence and negligent misrepresentation; tortious interference with business relations; conversion and theft by conversion; unjust enrichment; equitable estoppel; wrongful termination and constructive discharge; retaliation; violations of wage-and-hour laws; violation of the Consolidated Omnibus Budget Reconciliation Act (COBRA); intentional infliction of emotional distress; negligent infliction of emotional distress; and defamation. *Id.* ¶¶ 44–50, at 26.

Columbo seeks $5 million in damages. *Id.* at 27. The damages include the compensation Defendants allegedly owe Columbo per the "terms of his employment," earnings on the deferred-compensation plan he would have received had Defendants properly invested and managed the funds, liquidated damages, statutory interest for all compensation owed to him, punitive damages, and attorneys' fees and costs in the present action. *Id.* at 27–28. Columbo further seeks permanent injunctive relief ordering Defendants to set aside the funds that should have been previously

designated to him, as well as permanent injunctive relief requiring Defendants to direct its insurance counsel to resolve all legal claims involving him and to indemnify him and shield him from further liability. *Id.* at 28.

## PROCEDURAL HISTORY

Columbo initiated this action on January 28, 2022. On June 17, 2022, Defendants filed a partial motion to dismiss. On August 18, 2022, while the motion to dismiss was still pending, Plaintiff sought leave to amend his Complaint. On January 30, 2023, this Court granted Plaintiff leave to amend and accordingly denied Defendants' partial motion to dismiss as moot.

On March 6, 2023, Plaintiff filed an Amended Complaint (herein "Complaint"). On April 24, 2023, Defendants again filed a partial motion to dismiss for failure to state a claim. Defendants' motion seeks to dismiss all of Columbo's claims except his breach-of-contract claim against the Hotel. Oral argument was held on October 30, 2023.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To plead a plausible claim, a plaintiff need not show the alleged misconduct was probable, but he must show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Pleading "facts that are 'merely consistent with' a defendant's liability, . . . 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In determining whether a plaintiff's complaint is "sufficient to cross the federal court's threshold," *Skinner v.*

*Switzer*, 562 U.S. 521, 529–30 (2011), a court must "accept[ ] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick*, 861 F.3d at 35.

## DISCUSSION

### I.      Breach of Contract Claim, As to All Defendants Except the Hotel

"[I]t is well established in New York that an officer of a corporation is not individually liable for the contractual obligations of that corporation absent a clear intent to create individual liability." *Liu Jo S.P.A. v. Jenner*, 630 F. Supp. 3d 501, 518 (S.D.N.Y. 2022). That a corporate executive, "acting in his official capacity, took actions that resulted in [a] breach [of contract], does not render him personally liable." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1177 (2d Cir. 1993); *see also Puma Indus. Consulting, Inc. v. Daal Assocs., Inc.*, 808 F.2d 982, 986 (2d Cir. 1987). Even assuming the individual Defendants, who are officers of corporations and companies with ownership stakes in the Hotel, are officers of the Hotel itself, Columbo pleads no facts that can support the conclusion that they acted outside the scope of their official capacities for breach of contract.

"[T]he concept of piercing the corporate veil" is an exception to "accepted principles that a corporation exists independently of its owners, as a separate legal entity, that the owners are normally not liable for the debts of the corporation, and that it is perfectly legal to incorporate for the express purpose of limiting the liability of the corporate owners." *Morris v. N.Y. State Dep't of Tax'n & Fin.*, 623 N.E.2d 1157, 1160 (N.Y. 1993). In New York, piercing of the corporate veil requires a showing that "(1) the owner has exercised such control that the corporation has become a mere instrumentality of the owner, which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjust loss or injury to plaintiff." *Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1052 (2d Cir. 1997).

Defendants contend that Columbo may only bring a breach-of-contract claim against the Hotel for its failure to manage and disburse his deferred-compensation funds in accordance with the provisions explained in Exhibit A—and not against any other Defendant. In particular, Defendants argue that the non-Hotel Defendants cannot be liable for breach of contract because corporate officers and equity owners are not personally liable for contracts between an employee and a corporation. Columbo counters that the corporate veil may be pierced in order to hold the other Defendants liable and that, alternatively, provisions in the Fair Labor Standards Act (FLSA) and the New York Business Corporation Law subject all Defendants to liability for breach of contract.

Columbo has pled no facts to support the allegation that any of the individual Defendants have exercised such control over the Hotel as to render it a mere instrumentality. Columbo asserts that Defendants were in complete control of "matters related to Plaintiff" including management of Plaintiff's deferred-compensation plan, "the hiring and firing personnel, work schedules, payroll, decisions related to health insurance and other benefits, decisions related to contractors and vendors, litigation strategy, budgets, and decisions related to the mistreatment of Plaintiff." Pl.'s Opp'n to Defs.' Mot. to Dismiss (herein "Opp'n") at 13–14. But such allegations alone do not establish a level of authority over the Hotel sufficient to pierce the corporate veil. *See Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 56 (2d Cir. 2012) (holding that "an individual's mere status as a supervisor with power to hire or fire is not sufficient to render that individual an alter ego of an employer"); *In re Lyman Good Dietary Supplements Litig.*, No. 17-cv-8047, 2018 WL 3733949, at *7 (S.D.N.Y. Aug. 6, 2018) (holding that acting as the primary decisionmaker, running the day-to-day business, and hiring staff are not sufficient to "allege complete domination"); *see also Danuri Tex Co. v. Yoco Inc.*, No. 19-cv-9187, 2020 WL 4735190, at *1, 4

(S.D.N.Y. Aug. 14, 2020) (holding that a showing that the principal owner of a company had the sole "authority" to "place[] orders on behalf of the Corporate Defendants . . . [was] wholly insufficient to establish an exercise of complete domination"); *Usov v. Lazar*, No. 13-cv-818, 2013 WL 3199652, at *5 (S.D.N.Y. June 25, 2013) (holding that a president of a company who was exclusively in charge of purchases and sales did not "exercise[] the considerable authority over the corporation" required to pierce the corporate veil for a breach-of-contract claim). For these reasons, Columbo has failed to plead a claim for breach of contract based on piercing the corporate veil.

Columbo also argues that Defendants are liable for breach of contract under the FLSA and New York Business Corporation Law. But "employees – and particularly highly paid employees – cannot use the FLSA to pursue breach of contract claims" because it is "not a vehicle for litigating breach of contract disputes between employers and employees." *Momin v. Quantierra Advisors LLC*, No. 21-cv-612, 2022 WL 2002282, at *2 (S.D.N.Y. June 3, 2022); *see also Rogers v. City of Troy*, 148 F.3d 52, 57 (2d Cir. 1998) (holding that the FLSA "does not convert every suit involving the breach of an employment contract into a federal case" under the FLSA).

Columbo's argument that Defendants are liable for breach of contract under New York Business Corporation Law § 630 similarly fails. That law allows for the "ten largest shareholders" to "jointly and severally be personally liable for all debts, wages or salaries due and owing to any of its laborers, servants or employees other than contractors, for services performed by them for such corporation." N.Y. Bus. Corp. Law § 630(a). But it also requires an employee to serve the shareholders with notice that he intended to hold them liable within 180 days of the termination of his employment, which Columbo does not plead he has done. Additionally, liability under this section only attaches "if there is a judgment against [a defendant] and [the defendant] fails to

satisfy the judg[]ment," which has not occurred. *Alves v. Affiliated Care of Putnam, Inc.*, No. 16-cv-1593, 2020 WL 1002817, at *15 (S.D.N.Y. Mar. 30, 2022); N.Y. Bus. Corp. Law § 630(a).

Accordingly, the Court dismisses Columbo's claim for breach of contract against all Defendants except the Hotel.[2]

## II.    Quasi-Contract Claims

### A.  Conversion and Theft by Conversion[3]

New York law requires a plaintiff to allege the following to state a claim for conversion: "(1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." *Apple Mortg. Corp. v. Barenblatt*, 162 F. Supp. 3d 270, 284 (S.D.N.Y. 2016). "Under New York law, when a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in . . . conversion . . . are generally precluded, unless based on a duty independent of the contract." *Novick v. AXA Network, LLC*, 714 F. App'x 22, 24 (2d Cir. 2017). To evaluate whether a tort cause of action is based on the same facts as a breach-of-contract cause of action, and should thus be dismissed as duplicative, courts look to the facts alleged as to each claim. *See,*

---

[2] As to Columbo's state-law claims, Defendants argue in the alternative that, were his deferred-compensation plan subject to the Employee Retirement Income Security Act (ERISA), such claims would be preempted. Defs.' Mot. to Dismiss at 21; *see Aetna Health Inc. v. Davila*, 542 U.S. 200, 208–09 (2004) (holding that ERISA "provide[s] a uniform regulatory regime over employee benefit plans" and "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted"). The Court need not address this argument, as Columbo does not appear to allege that the plan was governed by ERISA, nor does he bring any claims under ERISA.

[3] Although Columbo brings causes of action for "theft by conversion" and "conversion," Compl. at 26, the Court has not found, and Columbo has not provided, any cases that recognize a distinct tort for "theft by conversion" in New York.

*e.g.*, *Mortg. Resol. Servicing, LLC v. JPMorgan Chase Bank, N.A.*, No. 15-cv-293, 2018 WL 1627257, at *3 (S.D.N.Y. Mar. 30, 2018).

Columbo asserts that Defendants "converted funds that had been dedicated to Columbo for their own business and personal use and benefit" and that they "withdrew those funds for their own use and benefit." Compl. ¶ 46b; *see also* ¶ 43.[4] To support this allegation, Columbo avers that on March 17, 2011, Defendants transferred the funds they contributed to his deferred-compensation plan to cover the operational needs of the Hotel. *See* Compl. ¶ 22, Ex. B (containing a ledger showing Columbo's funds had been loaned to the Hotel's operational account).

Courts in this district have explained that where a contract provides for the management of a plaintiff's funds, but the defendant uses those funds for another purpose, a cause of action for conversion may lie in addition to one for breach of contract. *See Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 377 (S.D.N.Y. 2020) (holding that, where buyers of a hotel "not only allege[d] that Defendants mishandled the capital reserve funds by failing to treat them as required by the [agreement], but also that Defendants were pocketing them" under the guise of "management fees," they may bring both breach-of-contract and conversion claims); *Key Bank of New York v. Grossi*, 642 N.Y.S.2d 403, 405 (N.Y. App. Div. 1996) (holding that a plaintiff plausibly pled a conversion claim where it alleged that the defendant, who was supposed to sell assets on behalf of the plaintiff, not only failed to "treat the proceeds in a particular matter," per their agreement, but also used the proceeds to pay the defendant's creditors and other customers). Here, Columbo not only alleges that Defendants failed to maintain a deferred-

---

[4] The Amended Complaint contains two paragraphs numbered "46." Compl. at 21–22. For purposes of this Opinion, the first paragraph labeled "46," which begins on page 21, is labeled "46a" and the second, which begins on page 22, is labeled "46b."

compensation account as laid out in the contract, but that they took funds from the account to use for the Hotel's operational expenses.

Columbo has identified a $382,374.57 debt owed to him under the deferred-compensation plan, plus interest and earnings that were to have been accumulated by the funds had they not been transferred out of his account, less the $60,000 that Defendants paid him. Compl. ¶¶ 22, 38. He has also alleged that he repeatedly asked for confirmation that the funds would be dispersed to him upon retirement, and then, at the point he retired, asked that they be reimbursed. Compl. ¶¶ 33–37. Aside from the $60,000, Defendants have failed to do so. Compl. ¶ 38. Given that Columbo did not know that the deferred-compensation funds were being used to cover operational expenses, he did not authorize their transfer. Columbo thus plausibly states a claim for conversion as against the Hotel.

Columbo has also adequately stated a claim for conversion as to Defendants Chess and Michael Pilevsky, whom Columbo alleges acted on the Hotel's behalf. "The tort of conversion does not require defendant's knowledge that he is acting wrongfully, but merely an intent to exercise dominion or control over property in a manner inconsistent with the rights of another." *LoPresti v. Terwilliger*, 126 F.3d 34, 42 (2d Cir. 1997); *see also id.* (holding that the district court "mistakenly relied upon the fact that [an employee] was acting on behalf of the Company to exonerate him from liability for conversion" for using union dues to pay company creditors rather than forwarding the dues to the union per their agreement). Email correspondence demonstrates that Chess and Michael Pilevsky knew the Hotel had transferred funds out of Columbo's account for the purpose of funding the Hotel's operations, and that they owed him that money. Compl. Ex. C. Drawing reasonable inferences in favor of Columbo, the Court may infer that Chess and Michael Pilevsky had access to and control over the Hotel's funds and were keeping the money

from Columbo's fund in the Hotel's operations account without his approval. As to Gindi, Sultan, and Philip Pilevsky, Columbo's assertion that they "acknowledged that this money was dedicated and due to Columbo," Compl. ¶ 33, is not enough to show that they had the intent to exercise dominion or control over the funds.

Accordingly, the Court denies Defendants' motion to dismiss as to Columbo's conversion claim against Chess, Michael Pilevsky, and the Hotel. The Court dismisses Columbo's conversion claim against the other Defendants.

### B.  Promissory Estoppel

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance." *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

Columbo asserts that Defendants promised to manage and disburse the deferred-compensation funds and to provide him with lawful wages while he remained available during the transition period, health insurance, and legal representation in connection with his employment. Defendants argue that Columbo's claim for promissory estoppel fails because it is duplicative of his contract claim and because he failed to plead that he suffered an unconscionable injury that would give rise to recovery under a theory of promissory estoppel.[5]

---

[5] Whether a showing of unconscionable injury is always required for promissory-estoppel claims under New York law is not altogether clear. *Cyberchron Corp. v. Calldata Sys. Dev.*, 47 F.3d 39, 44 (2d Cir. 1995) (holding that "an unconscionable injury is sometimes required to fulfill the third requirement"). Some courts have mandated a showing of unconscionability only where promissory estoppel is asserted to counter the effects of the Statute of Frauds. *See, e.g.*, *id.* (collecting cases). *But see In re Ionosphere Clubs, Inc.*, 85 F.3d 992, 999–1000 (2d Cir. 1996) (stating that promissory estoppel requires a showing of, among other things, "an unconscionable injury as a result of the reliance"). The Court need not address this issue because Columbo has failed to allege facts supporting the other required elements of promissory estoppel.

A claim for promissory estoppel is duplicative of a claim for breach of contract "unless the plaintiff alleges that the defendant had a duty independent from any arising out of the contract." *Hallett v. Stuart Dean Co.*, 481 F. Supp. 3d 294, 307 (S.D.N.Y. 2020). Defendants' alleged promise "to set aside, manage, and distribute deferred compensation funds to Plaintiff," Opp'n at 14, is duplicative of the terms of the agreement alleged in Columbo's Complaint, Compl. Ex. A. As to Columbo's claim for the funds he is owed under the deferred-compensation plan, this is not an instance in which a plaintiff is "permitted to proceed on both contractual and quasi-contractual theories" because the defendants "dispute the existence of a valid, enforceable contract." *Hallett*, 481 F. Supp. 3d at 307. Defendants here do not contest that a valid contract exists. Defs.' Mot. to Dismiss at 7 (stating "Defendants are not arguing against the existence of an agreement between Plaintiff and the LLC" and referring to Exhibit A of the Complaint).

Defendants' alleged promise to pay Columbo compensation for his efforts during the transition period, as well as to provide him with health insurance and legal counsel in employment-related matters, also cannot provide the basis for a promissory-estoppel claim. Even assuming his cursory allegation that Defendants promised to "compensate[]" him for his "time and effort," during the transition, Compl. ¶ 35, is adequately pled, Columbo has failed to allege the requisite reliance and injury. The Complaint does not indicate whether Columbo actually expended any time or effort during this transition period nor, if so, how much he was owed. Columbo has similarly failed to plead facts supporting the contention that he relied on Defendants' promise to provide him legal representation in matters related to his employment. In fact, the Complaint states that Columbo continued to participate in suits by former employees against the Hotel even before he was provided with his own attorney by Defendants' insurance company following his filing of the Complaint in this case. *Id.* ¶¶ 48–49. Finally, Columbo has failed to plead that he incurred any

injury from Defendants' termination of his health insurance four days before the end of the period through which he had paid. For these reasons, Columbo has not plausibly alleged a claim based on promissory estoppel.

At oral argument, counsel for Columbo argued that Chess's promise to provide Columbo with $10,000 of his deferred-compensation fund as he transitioned out of employment constituted an additional instance of promissory estoppel. Oral Argument Tr. 30:4–17. Even if Columbo were able to show that promise arose from a duty separate from that in his contract, however, he could not show injury, as Chess ultimately did transfer the $10,000 to Columbo. Oral Argument Tr. 30:13–15.

Accordingly, the Court dismisses Columbo's claim for promissory estoppel.

### C. Breach of Fiduciary Duty

In New York, a fiduciary relationship is established by a showing that (1) a duty existed; (2) there was a knowing breach of that duty; and (3) damages resulted from that breach. *See Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011). Columbo alleges that Defendants owed him a fiduciary duty to manage the funds in his retirement plan and to provide him with health insurance. *See* Compl. ¶ 46b; Opp'n at 15. At oral argument, Columbo's counsel argued that Defendants' fiduciary duty arose from their "responsibility to calculate, set aside, [and] manage money on behalf of" Columbo per the alleged contract, as well as "to provide him with health insurance benefits that he contributed to and relied upon." Oral Argument Tr. 31:8–16.

As an initial matter, "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." *William Kaufman Org., Ltd. v. James LLP*, 703 N.Y.S.2d 439, 442 (N.Y. App. Div. 2000). Nowhere in the Complaint did Columbo plead

facts that could support the contention that Defendant's management of the deferred-compensation funds resulted in a separate duty apart from the one defined by his contract.

Furthermore, the fact that parties are in a contractual relationship does not, on its own, create a fiduciary relationship under New York law. *See Draskicevic v. Entersport Mgmt., Inc.*, No. 03-cv-8447, 2004 WL 1575393, at *2 (S.D.N.Y. July 15, 2004) ("Under New York law, an implied duty of good faith exists in all contracts and does not by itself create a fiduciary relationship."). Nor does an employer-employee relationship create a fiduciary relationship. *See, e.g.*, *Rather v. CBS Corp.*, 886 N.Y.S.2d 121, 125 (N.Y. App. Div. 2009) ("The law . . . enunciated in every reported appellate-division-level case, is that employment relationships do not create fiduciary relationships."); *see also Lind v. Vanguard Offset Printers, Inc.*, 857 F. Supp. 1060, 1067 (S.D.N.Y. 1994) ("[U]nder New York law, an employer-employee relationship is not fiduciary in nature.").

Contrary to Columbo's urging, the length of an employee's tenure working for his employer cannot convert an employer-employee relationship into a fiduciary relationship because it is "irrelevant to, and does not support, [a] claim of fiduciary relationship." *Rather*, 886 N.Y.S.2d at 125; *see also Faulkner v. Arista Records LLC*, 602 F. Supp. 2d 470, 482 (S.D.N.Y. 2009) (holding that "conclusory allegations that a contractually-bound record company and recording artist shared a long and enduring relationship . . . of trust and confidence are insufficient to plead a fiduciary relationship and survive a motion to dismiss"). Columbo's claim that he had a "special relationship" with Defendants that "transcended simply being an employer and employee" because he was "dedicated and lo[y]al to serving Defendants for twenty [] years," Compl. ¶ 46b, thus does not establish a fiduciary duty.

Columbo's reliance on the fact that Gindi "was a good friend for decades and the best man in [his] wedding," *id.*, is also misplaced. Columbo has not pled any additional facts to establish that his friendship with Gindi transformed their arms' length relationship into a fiduciary one. *See Kuriyan v. Schreiber*, 175 N.Y.S.3d 504, 505 (N.Y. App. Div. 2022) ("That plaintiff allegedly considered [Defendant] a personal friend, and had a longstanding professional relationship with him, does not, standing alone, suffice to allege a special relationship of trust and confidence."); *Benzies v. Take-Two Interactive Software, Inc.*, 73 N.Y.S.3d 557, 559 (N.Y. App. Div. 2018) (holding that where a complaint "alleges only arm's length business transactions," a "showing" of "close friendship" is "not sufficient to establish the necessary requirement of trust and confidence" to support a fiduciary relationship).

Accordingly, the Court dismisses Columbo's fiduciary-duty claim.

### D.  Fraud and Intentional Misrepresentation

"Under New York law, fraud requires proof of (1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015) (citing *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (N.Y. 2009)). Federal Rule of Civil Procedure 9(b) requires that when pleading a claim of fraud, "a party must state with particularity the circumstances constituting fraud." To comply with Rule 9(b), a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Harsco Corp. v. Segui*, 91 F.3d 337, 347 (2d Cir. 1996).

"It is black letter law in New York that a claim for common law fraud will not lie if the claim is duplicative of a claim for breach of contract." [6] *EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 233 (S.D.N.Y. 2012). However, "parallel fraud and contract claims may be brought if the plaintiff (1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007); *see also Krantz v. Chateau Stores of Can. Ltd*., 683 N.Y.S.2d 24, 25 (N.Y. App. Div. 1998).

Columbo has not alleged any "separate" legal duty other than Defendants' duty to perform under the contract. The same statements Columbo claims Defendants made fraudulently, were also made in furtherance of his contract. *See* Oral Argument Tr. 32:14–33:6 (stating that Columbo's claim for fraud relies upon yearly "discussions" between Columbo and various Defendants "about money being managed" and "available for Mr. Columbo's benefit," when "they knew it wasn't"); *id.* at 16:17–17:11 (stating that statements made during these annual discussions were "[i]n furtherance of the contract, in particular as it related to . . . the contributions that were promised to be made, the representations that were being made about the money that was to be set aside, [and] the representations that were made about the management of those funds for plaintiff"); *see also Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, No. 13-cv-5193, 2014 WL 1329144, at *4 (S.D.N.Y. Apr. 3, 2014) (holding that, where a plaintiff used a defendant's knowledge of the terms of the contract to support its fraud claim, that "demonstrat[ed] that the two claims are duplicative").

---

[6] Claims of intentional misrepresentation share the same elements as common-law fraud under New York law and are evaluated in the same manner. *See Pilkington N. Am. v. Mitsui Sumitomo Ins. Co. of Am.*, 420 F. Supp. 3d 123, 141 (S.D.N.Y. 2019); *see also Sabre Int'l Sec., Ltd. v. Vulcan Cap. Mgmt., Inc.*, 944 N.Y.S.2d 36, 42 (N.Y. App. Div. 2012) ("To the extent plaintiff alleges intentional misrepresentation, the claim is duplicative of the . . . cause of action for fraud."). "Intentional misrepresentation claims may be dismissed where the claims overlap entirely with a parallel contract claim." *Pilkington N. Am.*, 420 F. Supp. 3d at 140.

Furthermore, while Columbo generally pleads he is owed punitive damages for "the malicious and intentional manner in which Defendants decided to treat and treated Columbo," he does not allege for which claims he seeks such damages. Compl. at 28. "A general request for punitive damages is not enough to differentiate the damages recoverable for fraud from those sought for breach of contract," and, thus, Columbo has not alleged that he seeks "special damages that are unrecoverable as contract damages." *Allen v. Cox*, No. 10-cv-118, 2011 WL 2436705, at *4 (S.D.N.Y. June 16, 2011).

This claim thus turns on whether Columbo has plausibly pled a misrepresentation that was "collateral or extraneous" to the breach of contract he alleges. *Merrill Lynch & Co.*, 500 F.3d at 183. New York distinguishes between "contractual promises regarding prospective performance," which duplicate breach-of-contract claims, and "misstatements and omissions of present facts," which may give rise to separate common-law fraud claims. *Id.* at 184. Misrepresentations of present fact may induce a plaintiff "to remain in the agreement," breaching a collateral duty. *BJB Ltd. v. iStar Jewelry LLC*, 533 F. Supp. 3d 83, 103 (E.D.N.Y. 2021); *see also Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, No. 00-cv-9214, 2003 WL 1751780, at *8 (S.D.N.Y. Apr. 1, 2003).

Columbo argues that his fraud claim is based on representations made by Sultan, Gindi, and Philip Pilevsky over the course of many years, assuring him that his deferred-compensation account was being funded in accordance with the terms of their contract. Pl.'s Opp'n at 15–16. Columbo also argues Chess committed fraud when she told him that Defendants planned to honor their commitment to pay him what he was owed under the deferred-compensation plan. *Id.* at 16. Even though Columbo has not directed the Court to any particular paragraphs, these allegations appear to be located in paragraphs 21, 26, 33, and 36 of the Complaint.

In paragraph 21, Columbo alleges that Gindi and Sultan "represented on behalf of Defendants . . . that the funds that had been calculated would be directed to Columbo's retirement account and managed for him." Compl. ¶ 21. This statement constitutes a future promise, at least until March 17, 2011, when Columbo's funds were allegedly transferred out of his account for use by the Hotel. Compl. ¶ 22. Such statements are not "collateral or extraneous" to the contract because they are "promissory statement[s] of what will be done in the future that give[] rise only to a breach of contract cause of action." *Merrill Lynch & Co.*, 500 F.3d at 184.

The statements made following the transfer of Columbo's funds out of his account in March 2011, however, arguably constitute a "misrepresentation[s] of present facts" which are "collateral to the contract." *Id.* So too do Gindi's and Sultan's statements as alleged in paragraph 26, that "the calculated amount of annual contributions, plus earnings on those funds over the time that [the funds] should have been separately designated and managed . . . would be paid out to Columbo when he left the Hotel or retired." Compl. ¶ 26. Columbo has further alleged that Gindi and Sultan told him, "Don't worry. We're going to take care of you and make you whole." *Id.* While these "appear[], initially," to be "future promise[s]," "if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact." *See Stewart v. Jackson & Nash*, 976 F.2d 86, 89 (2d Cir. 1992). Here, Gindi and Sultan allegedly promised to make Columbo "whole" using the funds in his deferred-compensation account, but at the time, there were no such funds held in Columbo's account. Compl. ¶ 22.

In any event, even if Columbo's allegations after 2011 demonstrate that his fraud claim is not duplicative of his contract claim, he has nonetheless failed to adequately plead the fraud claim. Columbo does not allege that Gindi and Sultan had knowledge of the falsity of their statements

that funds were being contributed to his account as outlined in the deferred-compensation plan. *See Loreley Fin. (Jersey) No. 3 Ltd., LLC*, 797 F.3d at 170. Although Columbo does allege that his funds had been transferred out of his account, he does not allege who transferred the funds, nor who knew about that transfer. *See* Compl. ¶ 22 ("Defendants decided to 'loan' [his] dedicated funds to meet the operational needs of the Hotel."). The Complaint merely alleges that by August 27, 2018, the Hotel's Chief Financial Officer (not a defendant in this litigation) prepared a ledger showing a $382,374.57 debt to Columbo for deferred compensation. *Id.* The allegation that "there was no intent on behalf of the individual Defendants now in charge of things to honor their commitment to fund the account," Compl. ¶ 33, is a conclusory statement that the Court may not credit to show Gindi's and Sultan's knowledge. Therefore, Columbo's claim for fraud is not adequately pled as against Sultan and Gindi.

Columbo has also alleged that Philip Pilevsky made fraudulent statements. In paragraph 21, Columbo asserts that Philip Pilevsky "regularly represented to Columbo" that his annual "contributions to Columbo's compensation plan were approved by and being handled by the Hotel ownership group." *Id.* ¶ 21. Such statements may too be construed as containing misstatements and omissions about present facts after March 2011, which could give rise to a cause of action separate from Columbo's contract claim. This allegation, however, is not pled with the requisite specificity under Federal Rule of Civil Procedure 9(b) because Columbo has not provided any "supporting details establishing the 'when and where'" of Philip Pilevsksy's purported misrepresentations. *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 199 (S.D.N.Y. 2011).

In paragraph 26, Columbo alleges that in December 2019, Philip Pilevsky "gave Columbo . . . assurances . . . that Defendants appreciated his tireless contributions, recognized their financial

obligations to him through this deferred compensation plan that was intended to grow with his years of services, and would 'make good' on everything that was due to Columbo when he decided to retire." Compl. ¶ 26. Drawing reasonable inferences in Columbo's favor, this statement, too, could be construed as a material misrepresentation of current facts because it was made long after the funds were transferred out of the account held for Columbo. *See Stewart*, 976 F.2d at 89. However, for the same reasons explained above, Columbo has failed to allege that Philip Pilevsky had knowledge of the falsity of his misrepresentations regarding the deferred-compensation funds.

As to Defendant Chess, Columbo appears to allege that she committed fraud when she said that Defendants "fully intended to honor the financial commitments they made to Phil [Columbo]." Compl. ¶ 36. But again, any allegation of fraud based on this statement fails to meet the heightened pleading standard of Rule 9(b), because, among other things, Columbo has failed to state "where and when the statements (or omissions) were made." *Harsco Corp.*, 91 F.3d at 347. And even if this statement was made after March 2011, there are no allegations that she knew that Defendants did not intend to honor their financial commitments to Columbo at the time she made the statement.

To the extent Columbo attempts to base a claim of fraud against "[s]everal members of the Hotel's ownership and management – i.e., Philip Pilevsky, Sheila Chess, Isaac Gindi, [and] Zuri Sultan," on their "acknowledge[ment] that this money was dedicated and due to Columbo," Compl. ¶ 33, this allegation once again fails to meet the heightened pleading requirements of Rule 9(b) because it does not "detail" any statements, "state where and when the statements (or omissions) were made," or "explain why the statements (or omissions) are fraudulent." *Harsco Corp.*, 91 F.3d at 347.

Finally, Columbo relies on the allegation that there were "two (2) separate sets of financial information from Columbo and the Hotel's Chief Financial Officer," including a "set of 'fluffed'

numbers for submission to the bank in connection with Defendants' efforts to obtain favorable loans" in his fraud claim against Michael Pilevsky. Compl. ¶ 9; *see* Pl.'s Opp'n at 16. Even if Columbo had pled this alleged misrepresentation with specificity, he has not plausibly alleged the statement was meant to induce his reliance; if anything, Columbo alleges that Michael Pilevsky's misrepresentations were meant to induce banks to issue the Hotel a loan. Additionally, Columbo does not plead any facts as to his own "justifiable reliance" on such a statement, nor could he, since he was aware of Michael Pilevsky's statements about the false financial information. *See* Compl. ¶ 9 ("Columbo made it clear to Michael Pilevsky that the inflated projections were not supported by his budgets or actual numbers.").[7]

Accordingly, the Court dismisses Columbo's claims for fraud and intentional misrepresentation.

### E. Negligence and Negligent Misrepresentation

Under New York law, a claim for negligent misrepresentation requires "that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment." *Hydro Invs., Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).[8] No claim can lie against any of the individual Defendants because, "[u]nder

---

[7] The Complaint appears to imply that Michael Pilevsky had requested separate sets of financial information from the time Columbo started working at the Hotel. *See* Compl. ¶ 9 ("From . . . in or about 2002, Michael Pilevsky managed all of the banking needs of the Hotel . . . which involved frequent requests that Columbo provide the Hotel's financial information, budgets, and projections. Notably, Michael Pilevsky often requested two (2) separate sets of financial information from Columbo.").

[8] Although Columbo brings claims for both negligence and negligent misrepresentation, because he does not allege any specific duty that Defendants breached to support his claim for general negligence, the Court analyzed only the negligent-misrepresentation claim in detail. *See Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 326–27 (S.D.N.Y. 2012)

the 'duty' element, New York strictly limits negligent misrepresentation claims to situations involving actual privity . . . between the parties or a relationship so close as to approach that of privity." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012); *see also J.A.O. Acquisition Corp. v. Stavitsky*, 863 N.E.2d 585, 587 (N.Y. 2007). Columbo has not plausibly pled facts to establish he was in privity—or in a relationship approaching that of privity—with any party except the Hotel. When asked to clarify this point at oral argument, Columbo's counsel stated that there was "special expertise, special control, special trust in the relationship and the reliance upon Mr. Sultan, Mr. Gindi, [and] Mr. Pilevsky managing and doing things for Mr. Columbo's benefit." Oral Argument Tr. 34:2–7. That allegation is insufficient to show that Columbo was in near-privity with Sultan, Gindi, and Pilevsky.

As to the Hotel, generally, an "employer-employee relationship does not constitute a special relationship sufficient to support a claim for negligent misrepresentation." *Naughright v. Weiss*, 857 F. Supp. 2d 462, 470 (S.D.N.Y. 2012). That is because the "employer-employee relationship is not fiduciary in nature," and the "special relationship requirement will be satisfied only where the defendant owes the plaintiff a fiduciary duty." *Kwon v. Yun*, 606 F. Supp. 2d 344, 356 (S.D.N.Y. 2009).

The Court is uncertain as to which of Defendants' statements Columbo is claiming provides the basis for his negligent-misrepresentation claim. To the extent Columbo is alleging that representatives of the Hotel negligently misrepresented that his deferred-compensation plan was being funded when it was not, he does not plead that the Hotel took on a fiduciary duty outside of the employer-employee role. Where an employer fulfills some sort of special, additional financial fiduciary duty, it may be held liable for negligent misrepresentation. *See id.* at 356. But that is only

---

(dismissing a plaintiff's negligence claim on the ground that he failed to adequately plead that the defendants owed him "a duty independent from their obligations under the contract").

the case where the "thrust of the harm" is not a product of the employer-employee relationship. *Id.* at 356–57 (holding that false statements by an employer about its financial health induced a prospective employee-shareholder to accept employment—not to purchase stock—amounting to an allegation of "employment-related harms"). Here, the purpose of the deferred-compensation plan was to incentivize Columbo's performance and serve as a retirement benefit. Compl. ¶ 20. Additionally, as Defendants have argued, according to the terms of the deferred-compensation plan, the fund was to be invested at "Phil Columbo's direction," indicating that the terms of the plan did not confer upon the Defendants a special fiduciary duty. Compl. Ex. A; *see* Oral Argument Tr. 9:6–18.

To the extent Columbo is alleging that the Hotel negligently misrepresented his ability to earn wages, overtime or otherwise, or to be provided with counsel in suits against it which involved Columbo, "promises regarding wages and other benefits made by an employer to induce plaintiffs to work . . . d[o] not give rise to a fiduciary relationship sufficient to sustain a negligent misrepresentation claim." *Kwon*, 606 F. Supp. 2d at 356–57. An allegation that "plaintiff was a lifelong employee of defendant corporation" also does not "give rise to any special relationship for purposes of stating a negligent misrepresentation claim." *Id.*

In any event, even if Columbo had plausibly alleged negligence or negligent misrepresentation, "[s]tate common law negligence claims are . . . precluded by the exclusive remedy provisions of New York Worker's Compensation statute." *Ferris v. Delta Airlines, Inc.*, 277 F.3d 128, 138 (2d Cir. 2001); *see also Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997) (holding New York state's statutory "workers' compensation exclusivity . . . can and does bar state common law negligence claims"). Columbo has not brought a claim under this statute.

Accordingly, the Court dismisses Columbo's negligent-misrepresentation and negligence claims.

### F.  Tortious Interference with Business Relations

To state a claim for tortious interference with business relations under New York law, a plaintiff must plausibly allege "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

Columbo fails to assert facts supporting such a claim. He makes no mention of third-party business relations in the Complaint. In his opposition to Defendants' Motion to Dismiss, he appears to assert two third-party relationships with which Defendants interfered: (1) Columbo's health insurance company and (2) the legal counsel provided by Defendants' insurance company to defend Defendants in suits brought by former employees. Pl.'s Opp'n at 17. But nowhere in the Complaint does Columbo allege he had a business relationship with either entity or that Defendants injured these relationships. During oral argument, counsel for Columbo stated that "Defendants made decisions that adversely impacted. . . relationships" with "countless vendors and contractors and employees with whom [Columbo] had to deal with." Oral Argument Tr. 35:4–10. But neither during oral argument nor in the Complaint does Columbo provide any non-conclusory allegations as to the nature of any such business relationships with specific vendors, contractors, or employees, let alone that Defendants interfered in them with a wrongful purpose.

Accordingly, the Court dismisses Columbo's claim for tortious inference with business relations.

### G. Unjust Enrichment

Under New York law, "[t]he basis of a claim for unjust enrichment is that the defendant has obtained a benefit which in equity and good conscience should be paid to the plaintiff." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.2d 1177, 1185 (N.Y. 2012). Unjust enrichment "is not a catchall cause of action to be used when others fail" but rather "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* Such cases are typically those in which "the defendant, though guilty of no wrongdoing, has received money to which he or she is not entitled." *Id.* Where a plaintiff has alleged that a defendant has "committed actionable wrongs," "[t]o the extent that these claims succeed, the unjust enrichment claim is duplicative"; to the extent that the "plaintiff['s] other claims are defective, an unjust enrichment claim cannot remedy the defects." *Id.*

According to Columbo, his unjust-enrichment claim "rests in Defendants' arguably criminal acts, and in specific efforts taken by Plaintiff to serve Defendants even beyond his period of employment in reliance on misrepresentations by Defendants." Pl.'s Opp'n at 18. At oral argument, Columbo's counsel specified that he seeks redress for unjust enrichment due to "the fact that above and beyond his job responsibilities, [D]efendants expected from Mr. Columbo loyalty without limits, availability without limits, 24/7 access and availability to take care of [D]efendants not only in their business capacity but also personally, their family, their friends, around the clock, above and beyond his responsibilities in his role with the hotel." Oral Argument Tr. at 35:11–23.

"An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Corsello*, 967 N.E.2d at 1185; *see also Hua Xue v. Jensen*, No. 19-cv-1761, 2020 WL 6825676, at *13 (S.D.N.Y. Nov. 19, 2020) ("Unjust enrichment is an

equitable claim that is unavailable where an adequate remedy at law exists."). "Conventional" tort claims include statutory claims. *See Nachman v. Tesla, Inc.*, No. 22-cv-5976, 2023 WL 6385772, at *4–5 (E.D.N.Y. Sept. 30, 2023).

First, Columbo's unjust-enrichment claim for Defendants' alleged "arguabl[e] criminal acts" is duplicative. This allegation appears to be based on the Hotel's use of Columbo's deferred-compensation funds to cover its operational expenses. Pl.'s Opp'n at 18. A claim for unjust enrichment on this ground is duplicative of the tort claim for conversion, for the reasons discussed above. *See, e.g.*, *Pirri v. Cheek*, No. 19-cv-180, 2019 WL 2472438, at *5 (S.D.N.Y. June 13, 2019).

Second, to the extent Columbo's unjust-enrichment claim arises from his "24/7" work and service "beyond his period of employment," this claim is also duplicative, this time of his wage-and-hour claims. *See* Compl. ¶¶ 45–46b, at 27; Oral Argument Tr. 29:21–30:4. Although the Court dismisses these wage-and-hour claims for the reasons discussed below, courts may dismiss claims for unjust enrichment as duplicative even where the duplicated claim has been dismissed. *See, e.g.*, *Bermudez v. Colgate-Palmolive Co.*, 667 F. Supp. 3d 24, 44–47 (S.D.N.Y. 2023) (holding that the plaintiffs "do not sufficiently distinguish their unjust enrichment claim from their other claims, which all relate to the same factual allegations," and dismissing the complaint in full); *Klausner v. Annie's, Inc.*, 581 F. Supp. 3d 538, 551–52 & n.7 (S.D.N.Y. 2022) (dismissing a claim for unjust-enrichment that was duplicative of a plaintiff's "core theory of deception" after having dismissed all of her other claims); *Hua Xue*, 2020 WL 6825676, at *13 (dismissing an unjust-enrichment claim as duplicative because the "[p]laintiff's remedy lies in her fraud claims," while also dismissing her fraud claim); *see also Nachman*, 2023 WL 6385772, at *6 (holding that unjust-enrichment claims pled in the alternative "will not survive a motion to dismiss where plaintiffs fail

to explain how their unjust-enrichment claim is not merely duplicative of their other causes of action").

Columbo's wage-and-hour claims are premised on similar factual allegations as his claim for unjust enrichment. During oral argument, for instance, his counsel asserted that his unjust-enrichment claim is based on the fact that he worked "around the clock," Oral Argument Tr. 35:17–23, while also noting that his statutory claims are based on his "24/7" availability, *id.* 41:14–42:24. Columbo's unjust-enrichment claim is thus duplicative of his wage-and-hour claims. *See Bermudez*, 667 F. Supp. at 46. *But see Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 362 (E.D.N.Y. 2015) (holding that "because Count Two of the Amended Complaint seeking [non-overtime] wages has been dismissed, [the plaintiff's] common law claims are not duplicative of any other surviving statutory claims").[9]

Accordingly, the Court dismisses Columbo's unjust-enrichment claim.

### H. Equitable Estoppel

Equitable estoppel is meant "to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted" and "to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position." *Shondel J. v. Mark D.*, 853 N.E.2d 610, 613 (N.Y. 2006). While Columbo lists

---

[9] Regardless of the duplicative nature of his unjust-enrichment claim for uncompensated work, Columbo has failed to allege facts supporting the elements of the claim in his Complaint. The Complaint does not allege any specific facts as to what he should be paid for his "24/7" work and services performed during the transition period. Nor does he point the Court to any facts alleging that "equity and good conscience" warrant payment by Defendants. His Opposition further fails to clarify his argument, as it merely argues in a conclusory fashion "that equity and good conscience militate against permitting Defendants to retain what Plaintiff is seeking to recover." Opp'n at 18. Finally, to the extent Columbo alleges he rendered some sort of personal services to Defendants, he pleads no facts in the Complaint to support such a claim.

"estoppel" in his prayer for relief, Compl. at 26, and asserts in his Opposition that his equitable-estoppel claim is based on Defendants' "false representations and concealed material facts that they knew were false, upon which Plaintiff relied," Pl.'s Opp'n at 18–19, he does not allege any right that Defendants seek to assert that need be estopped.

Accordingly, the Court dismisses Columbo's equitable-estoppel claim.

## III.   Wrongful Termination and Retaliation

### A.  Wrongful Termination and Constructive Discharge

New York law does not recognize claims in tort for wrongful termination for at-will employees. *See, e.g.*, *Sullivan v. Harnisch*, 969 N.E.2d 758, 759 (N.Y. 2012) ("New York common law does not recognize a cause of action for the wrongful discharge of an at-will employee."); *McGill v. Buzzelli*, 828 F. App'x 76, 78 (2d Cir. 2020) (same). The same is true for claims of constructive discharge. *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, No. 08-13555, 2011 WL 2006341, at *3 (Bankr. S.D.N.Y. May 23, 2011) ("New York courts do not recognize an independent cause of action for constructive discharge by an at-will employee."); *Spivak v. J. Walter Thompson U.S.A., Inc.*, 685 N.Y.S.2d 247, 247 (1999) ("Since plaintiff was . . . an at-will employee, her causes of action for . . . constructive discharge were properly deemed untenable by the motion court.").

Columbo lists a cause of action for "[w]rongful termination/constructive discharge," Compl. at 26, and alleges that "by August 2021, Columbo, now seventy (70) years old and beaten down by Defendants' treatment of him and running the business under Defendants' demands, had no choice but to reach out to Defendants with his formal notice of retirement – or more aptly, his constructive discharge," *id.* ¶ 35. Columbo's attorney, however, admitted at oral argument that Columbo was an at-will employee. Oral Argument Tr. 37:24–25.

Accordingly, the Court dismisses Columbo's claims for wrongful termination and constructive discharge.

### B. Retaliation

New York law does not recognize a common-law claim for retaliation. *See Farmer v. Fzoad.com Enters. Inc.*, No. 17-cv-9300, 2020 WL 5569581, at *4 (S.D.N.Y. Sept. 17, 2020); *see also Cohen v. United States*, 640 F. Supp. 3d 324, 344 (S.D.N.Y. 2022), *aff'd sub nom. Cohen v. Trump*, No. 23-35, 2024 WL 20558 (2d Cir. Jan. 2, 2024) ("That a handful of New York cases . . . mention the word 'retaliation' does not demonstrate a freestanding New York common law tort claim for retaliation.").

Columbo's Complaint states no statutory basis for his retaliation claim. After having been given the opportunity to provide the Court with a statute at oral argument and in a supplemental letter following argument, counsel for Columbo has not done so. Oral Argument Tr. 38:16–39:12; *see* Pl.'s Suppl. Letter, ECF No. 83 (Nov. 10, 2023) (stating only that "[g]eneral whistleblower protection statutes, such as N.Y. Lab. Law 215, contain anti-retaliation provisions").

Even if the Court were to construe Columbo's claim under New York Labor Law ("NYLL") § 215, he fails to plausibly allege a claim under that law. Retaliation claims under this statute require a plaintiff to show participation in a protected activity and a causal connection between the activity and an adverse employment action. *See Rodriguez v. Franco Realty Assocs., LLC*, No. 22-cv-6380, 2023 WL 8762994, at *3 (S.D.N.Y. Dec. 19, 2023). Columbo appears to allege that his expression of "surprise, disagreement, and concern" about the Hotel's layoff of staff at the start of the COVID-19 pandemic constitutes the protected activity. Compl. ¶ 27; Oral Argument Tr. 40:2–23. It is true that "[i]nformal complaints suffice to confer protection against retaliation, and the employee need not specify the New York Labor Law provision that the

employer allegedly violated." *Rodriguez*, 2023 WL 8762994, at *3. However, even assuming Columbo has alleged that he participated in protected activity, he has failed to plead any facts that show a causal connection with an adverse employment activity.

Accordingly, the Court dismisses Columbo's retaliation claim.

## IV.    Statutory Violations

Columbo refers generally to "violation[s] of federal, state, and local laws" and brings claims for "violations of wage and labor laws" without specifying the specific laws on which his claims lie. Compl. ¶¶ 43–44, 46a–47; at 26. He also alleges that Defendants violated the Consolidated Omnibus Budget Reconciliation Act (COBRA). *Id.* ¶¶ 15, 47.

### A.  Violations of Wage and Labor Laws

The FLSA "requires payment of minimum wages and overtime wages only" and "is unavailing where . . . hours do not rise above the overtime threshold." *Nakahata v. N.Y. Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 201–02 (2d. Cir. 2013). Columbo thus cannot state a claim for non-overtime, unpaid wages under the FLSA. *Id.* The NYLL, by contrast, does allow for claims in which a plaintiff seeks non-overtime pay for "hours worked without compensation." *Id.* at 202; N.Y. Labor Law § 663(1) ("If any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article, he or she shall recover in a civil action the amount of any such underpayments."). But because Columbo's allegations amount to nothing more than "legal conclusions couched as factual allegations," his claim cannot move forward. *See* Compl. ¶ 44 ("In violation of federal, state, and local labor laws, Defendants failed to pay proper wages to Columbo for the work that they requested of him . . . including regular pay."); ¶ 45 (stating Defendants "failed to pay lawfully earned wages at regular and overtime rates of pay"); *see also Stadnick*, 861 F.3d at 35. Columbo

also appears to argue that he was entitled to some sort of compensation during the transition period, Compl. ¶¶ 44, 46b, but he does not state with any specificity the terms of any arrangement that governed during this period, the wages he was promised, and/or what he was owed.

Regarding Columbo's claim for overtime wages, under both the FLSA and the NYLL, "a plaintiff must allege only that [he] worked compensable overtime in a workweek longer than forty hours, and that [he] was not properly compensated for that overtime." *Burns v. Scott*, 635 F. Supp. 3d 258, 276 (S.D.N.Y. 2022). By alleging first, that he was "asked to work seven (7) days per week, available twenty-four (24) hours per day" and "to be available to Defendants around the clock" during the COVID-19 pandemic, and second, that Defendants failed to pay him overtime, Compl. ¶¶ 30–32, 44–45, Columbo has pled facts as to both prongs of the inquiry, *see Herrera v. Comme de Garcons, Ltd.*, 84 F.4th 110, 115 (2d Cir. 2023) (holding that "plaintiffs who plausibly allege that they worked in excess of forty hours for multiple weeks without overtime" stated a claim for overtime wages).

Both the FLSA and the NYLL, however, provide that while exempt employees are entitled to overtime wages, nonexempt employees are not. *See Ramos v. Baldor Specialty Foods*, 687 F.3d 554, 556 n.1, 558–59 (2d Cir. 2012). An exempt employee is "any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). "The application of an exemption to the FLSA is an affirmative defense that may only form the basis for a Rule 12(b)(6) dismissal if it appears on the face of the complaint." *Coker v. Goldberg & Assocs. P.C.*, No. 21-cv-1803, 2022 WL 874719, at *2 (S.D.N.Y. Mar. 24, 2022); *see also Pani v. Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

To be exempt under the FLSA in a bona fide administrative capacity, the employee must be "'[c]ompensated on a salary or fee basis' pursuant to certain salary requirements" and have as

his primary duty "(1) . . . 'the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers'; and (2) . . . 'exercise of discretion and independent judgment with respect to matters of significance.'" *Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 127 n.7 (2d Cir. 2020) (quoting 29 C.F.R. § 541.200)). Columbo met the salary requirement at all times he was employed. *See* 29 C.F.R. § 541.200; Compl. ¶¶ 1, 29. The face of the Complaint makes clear that his duties included management. Even during the pandemic, during which time Columbo alleges that his job responsibilities were reduced, the Complaint states that he was in charge of managing the two remaining employees— the Chief Financial Officer and Chief Engineer. *Id.* ¶ 29. It also establishes that Columbo exercised his management duties with discretion, as he pleads that he was asked to "continue to handle everything." *Id.*

Accordingly, the Court dismisses Columbo's wage- and-labor-law claims.

### B.  COBRA

"COBRA does not compel employers to offer a group health care plan," nor to "maintain one that is in existence." *Local 217, Hotel & Rest. Emps. Union v. MHM, Inc.*, 976 F.2d 805, 809– 10 (2d Cir. 1992). Rather, COBRA merely obligates an employer who does maintain a group health plan to notify the plan administrator of an employee's loss of coverage due to a qualifying event so that the plan administrator can notify that employee about his right to continuation of coverage. *Id.* at 809. "Where a plan is terminated, there is no COBRA obligation on the employer or the administrator to provide continuation coverage," though "the plan administrator is contractually obligated to provide that coverage to the employees who select it and who pay the premium." *Id.* at 809–10.

According to the Complaint, Defendants "cut off Columbo's health insurance prematurely and without notice and failed to provide the required COBRA notifications." Compl. ¶ 47. This is not a proper claim under COBRA. Columbo alleges that although he paid for health insurance coverage through August 31, 2021, and his last day of employment was September 10, 2021, his coverage was terminated on August 27, 2021. Compl. ¶¶ 35, 40. He does not, however, allege that Defendants failed to notify the plan administrator that he lost insurance due to a qualifying event.

Accordingly, the Court dismisses Columbo's COBRA claim.

## V.   Intentional and Negligent Infliction of Emotional Distress

### A.  Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress requires a showing of "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Chanko v. Am. Broad. Cos. Inc.*, 49 N.E.3d 1171, 1178 (N.Y. 2015).

Columbo fails to allege any conduct that rises to the level of "extreme and outrageous"— "the element most susceptible to a determination as a matter of law." *Id.* at 1159. To establish the first element of an intentional-infliction-of-emotional-distress claim, a plaintiff must allege "conduct [that] has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 1178 (quoting *Howell v. N.Y. Post Co.*, 612 N.E. 699, 702 (N.Y. 1993)). "Courts have rarely recognized a claim for intentional infliction of emotional distress in an employment context, and when they have, the claim also included a claim of sexual battery." *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 111 (E.D.N.Y. 2011).

Columbo asserts that Defendants' conduct included terminating his employment without compensation and benefits, "badmouth[ing]" him, and unlawfully maintaining control over the legal strategy in cases against Defendants in which he was implicated. Pl.'s Opp'n at 19–20; *see also* Compl. ¶¶ 45, 48. This conduct does not meet the "rigorous, and difficult to satisfy standard." *Tebbenhoff v. Elec. Data Sys. Corp.*, 244 F. App'x 382, 384 (2d Cir. 2007) (holding that an employer's termination of a plaintiff, canceling his medical benefits, and threatening to withdraw business from a headhunter if it helped the plaintiff find new work, among other things, did not constitute extreme and outrageous conduct). An employee's "humiliating criticism, . . . insults, or other indignities" does not meet this standard either. *See Moleon v. Alston*, No. 21-cv-1398, 2021 WL 5772439, at *12–13 (S.D.N.Y. Dec. 3, 2021) (holding that a plaintiff's employer did not commit the requisite extreme and outrageous conduct when she falsely told third parties that the plaintiff had urinated in public; engaged in vandalism, gross misconduct, and unprofessional conduct; and might urinate in a customer's car in the future).

Columbo also cites threats by Philip Pilevsky for immediate termination without payout of his benefits if Columbo did not agree to increasing responsibilities and decreasing pay during the COVID-19 pandemic, threats by Gindi to drag out the present litigation, and "heightened, aggressive rhetoric from Sheila Chess" as causing him emotional distress. Compl. ¶¶ 29–30, 50; *see also* Pl.'s Opp'n at 19. But "[m]ere threats, annoyance or other petty oppressions, no matter how upsetting, are insufficient to constitute the tort of intentional infliction of emotional distress." *DiRuzza v. Lanza*, 685 F. App'x 34, 37 (2d Cir. 2017) (quoting *Owen v. Leventritt*, 571 N.Y.S.2d 25, 25–26 (N.Y. App. Div. 1991)).

Accordingly, the Court dismisses Columbo's claim for intentional infliction of emotional distress.

### B.  Negligent Infliction of Emotional Distress

In New York, a plaintiff may establish negligent infliction of emotional distress through the assertion of a "bystander" theory or a "direct duty theory." *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996). To assert a bystander theory, a plaintiff must claim he has been "threatened with physical harm as a result of defendants' negligence" and "consequently suffer[ed] emotional injury from witnessing the death or serious bodily injury of a member of [his] immediate family," which Columbo does not plead. *Id.*

To assert a direct duty theory, "a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (en banc). "To establish the fourth element, the plaintiff generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety." *Id.* at 81 n.57. Although Columbo does allege that he suffered emotional harm, such as stress, anxiety, and fear, and he pleads that he feared for his physical safety daily after the neighborhood became "riddled with homelessness and crime," Compl. ¶ 30, he fails to allege that Defendants breached any particular duty connected to that harm. "The duty in such cases must be specific to the plaintiff, and not some amorphous free-floating duty to society." *Mortise*, 102 F.3d at 696. Indeed, it is well settled in the employment context that an employer "does not owe a special duty to an individual employee, because it has an obligation to treat all employees in the same manner." *Alexander*, 829 F. Supp. 2d at 112.

Even if the Hotel were to owe a duty to protect its employees from dangers of the neighborhood in which it was located, Columbo does not plead that the Hotel owed him any "special duty" that would not apply to other employees whom it would be obligated "to treat in . .

. the same manner." *Hernandez v. Weill Cornell Med. Coll.*, No. 26191/2014E, 2015 WL 4173697, at *3 (N.Y. Sup. Ct. July 6, 2015). Additionally, courts have held that where a plaintiff's "fear and anxiety" is "produced" by his "own reaction to [a] defendant's directive to work" in certain conditions, such emotional harm "cannot be attributed to any negligence on [the] defendant's part." *Crooks v. Metro-N. Commuter R.R. Co.*, No. 93-cv-6030, 1994 WL 719683, at *2 (S.D.N.Y. Dec. 28, 1994). To hold otherwise would "impose a duty to avoid creating a stressful work environment," which would be a "dramatic[]" expansion of an employer's duty to encompass "the stresses and strains of everyday employment." *Id.* at *3 (quoting *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 554 (1994)); *Consol. Rail Corp.*, 512 U.S. at 554 (holding, in the Federal Employers' Liability Act context, that a railroad worker who complained that working alone in a remote area was unsafe, but was told by his employer to do so anyway, could not recover for negligent infliction of emotional distress when fatigue and stress caused him to momentarily lose consciousness and suffer injuries).

Columbo's claims that Defendants threatened to let him go without benefits if he did not work longer hours with less pay during COVID-19, that Defendants controlled his participation in litigation brought against them, and that Defendants failed to provide him with compensation and benefits that he was owed, similarly do not constitute negligent infliction of emotional distress. These allegations fall under a "corporation['s] duty to act honestly and in good faith in all its employment practices," which are not duties "unique" to a particular plaintiff. *Kelly v. Chase Manhattan Bank*, 717 F. Supp. 227, 235 (S.D.N.Y. 1989). Columbo has thus failed to allege facts as to what duty Defendants specifically owed him for the employment practices he alleges caused him harm.

In addition to the bystander and direct duty theories, New York "also recognizes a cause of action in cases where there is an 'especial likelihood of genuine and serious mental distress, arising from . . . special circumstances.'" *Baker v. Dorfman*, 239 F.3d 415, 421 (2d Cir. 2000) (quoting *Johnson v. State*, 37 N.Y.S.2d 638, 642 (N.Y. 1975)) (noting examples of "special circumstances," which have included the receipt of false information that one's mother died or false-positive HIV test results). Columbo pleads no such special circumstances and courts in this district have squarely held that "circumstances concerning the termination of employment were not sufficient 'special circumstances' to constitute a claim." *Vaughn v. Am. Multi Cinema, Inc.*, No. 09-cv-8911, 2010 WL 3835191, at *5 (S.D.N.Y. Sept. 13, 2010); *see also Dollman v. Mast Indus., Inc.*, No. 08-cv-10184, 2010 WL 3239067, at *340–41 (S.D.N.Y. Aug, 17, 2020); *Kelly*, 717 F. Supp. at 235.

In any event, even if had Columbo properly alleged a claim for negligent infliction of emotional distress, as discussed above, it would be precluded by the exclusive remedy in the state workers' compensation law. *See Torres*, 116 F.3d at 640; *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 327–28 (S.D.N.Y. 2012); *Vaughn*, 2010 WL 3835191, at *6; *Pasqualini v. MortgageIT, Inc.*, 498 F. Supp. 2d 659, 666 (S.D.N.Y. 2007).

Accordingly, the Court dismisses Columbo's claim for negligent infliction of emotional distress.

## VI.    Defamation

"Under New York law a defamation plaintiff must establish five elements: (1) a . . . defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability." *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019).

Columbo has failed to plausibly plead many, if not all, of the elements of a defamation claim. Without specifying any statements or when or to whom they were made, the Complaint merely alleges that he "has come to understand that Defendants – and in particular, the Pilevskys and Sheila Chess – have defamed [him] to third parties, including employees, contractors, and vendors (including their legal counsel), in an apparent attempt to blame him and to distract from and somehow rationalize their own unlawful, improper, and immoral actions." Compl. ¶ 50. Such threadbare factual allegations cannot support a claim for defamation. *See Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 250–52 (2d Cir. 2017) (holding that a plaintiff's allegation that the defendant news organization's reporting "contained one or more written false statements that were intended to impugn . . . [the p]laintiff's reputation in the sporting industry" was too vague to support a claim for defamation); *see also ADYB Engineered for Life, Inc. v. Edan Admin. Servs. Ltd.*, No. 19-cv-7800, 2021 WL 1177532, at *24 (S.D.N.Y. Mar. 29, 2021) ("A long line of cases in this District holds that a defamation claim is only sufficient if it adequately identifies the purported communication, and an indication of who made the communication, when it was made, and to whom it was communicated.").

Accordingly, the Court dismisses Columbo's defamation claim.

## VII.    Leave to Amend

"Ordinarily a plaintiff should be granted leave to amend at least once after having the benefit of a court's reasoning in dismissing the complaint." *Obra Pia Ltd. v. Seagrape Invs. LLC*, No. 19-cv-7840, 2021 WL 1978545, at *3 (S.D.N.Y. May 18, 2021). Under Federal Rule of Civil Procedure 15(a), "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). Although the Second

Circuit has held that it is not "an abuse of the district court's discretion to order a case closed when leave to amend has not been sought," *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1132 (2d Cir. 1994), a district court may *sua sponte* grant a party leave to amend. *See, e.g.*, *JoySuds, LLC v. N.V. Labs, Inc.*, 668 F. Supp. 3d 240, 262 (S.D.N.Y. 2023).

"When deciding whether to sua sponte grant leave to amend, courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the opposing party, and futility." *Id.* Although the Court is skeptical that Columbo will be able to address the deficiencies herein, the Court will permit him one opportunity to amend the Complaint.

## VIII.   Remedies

Defendants seek to dismiss Columbo's claims for punitive damages because such damages are not available for ordinary breach-of-contract claims. Defs.' Mot. to Dismiss at 27; Defs.' Reply at 10. "Under New York law, a plaintiff may recover an award for punitive damages on a tort claim where the defendant's actions rise to the level of 'gross, wanton, or willful fraud or other morally culpable conduct.'" *Jing Wang v. Tesla, Inc.*, No. 20-cv-3040, 2021 WL 3023088, at *5 (E.D.N.Y. July 16, 2021) (quoting *Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991)). The "trend among courts applying New York law seems to be to deny attempts to dismiss prayers for punitive damages at the motion to dismiss stage because it is 'not even clear that there is a requirement that a complaint seeking punitive damages must plead specific facts that would support an award of such damages.'" *Id.* (quoting *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 301, 318 n.5 (S.D.N.Y. 2010)). This is especially so where a plaintiff has alleged a claim that is "not coextensive with any claims for breach of contract"—here, the claim for conversion—and the defendant "has not made any attempt to set forth the applicable standards for punitive damages

relating to any of the plaintiffs' causes of action that are not covered by contract." *Burrell v. State Farm & Cas. Co.*, 226 F. Supp. 2d 427, 441 (S.D.N.Y. 2002).[10] For these reasons, Columbo's request for punitive damages are not denied at this juncture.

Columbo also seeks injunctive relief "compelling Defendants to refrain from using and set aside funds that should have been designated for Columbo" and "compelling Defendants to direct, and to refrain from restricting Columbo from directing, Defendants' legal insurance counsel to resolve all claims in any court or arbitration as they relate to Columbo personally and to indemnify and hold harmless Columbo from any further potential liability and/or expense." Compl. at 27–28. "A plaintiff seeking injunctive relief must plausibly allege '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" *Rand v. Travelers Indem. Co.*, 637 F. Supp. 3d 55, 73 (S.D.N.Y. 2022) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). As to Columbo's first request, he has not shown that monetary damages would not suffice to compensate his injury. As to Columbo's second request, he has pled no facts that show an irreparable injury. Thus, Columbo's request for injunctive relief is denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART AND DENIED IN PART. Columbo may proceed with his claim for breach of contract against the Hotel and for conversion against Defendants Chess, Michael Pilevsky, and the Hotel. Plaintiff shall have

---

[10] It appears Columbo's claim for liquidated damages relies on statutory provisions of the New York Labor Law. Opp'n at 22. Because the Court dismisses Plaintiff's statutory claims, it need not address Columbo's requested relief of liquidated damages.

thirty (30) days to amend his Complaint, provided he has a good-faith basis for doing so. Pursuant to Magistrate Judge Willis's Order dated January 2, 2024, the Parties are instructed to file a Case Management Plan within twenty-one days of this issuance of this Opinion.

The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 60.

SO ORDERED.

Dated:      March 15, 2024
            New York, New York

                                          _____
                                          Ronnie Abrams
                                          United States District Judge